J-S29040-21

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ANTONIO LAMBERT, | : | |
| | : | |
| Appellant | : | No. 2275 EDA 2020 |

Appeal from the Judgment of Sentence Entered September 17, 2020
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0502042-2001

BEFORE:     PANELLA, P.J., KUNSELMAN, J. and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED DECEMBER 21, 2021**

Appellant Antonio Lambert[1] appeals from the Judgment of Sentence[2] entered in the Court of Common Pleas of Philadelphia County following his conviction at a non-jury trial on the charges of third-degree murder, conspiracy to commit robbery, robbery, firearms not to be carried without a

---

[1] Appellant is also known as Terry Brown.  **See** N.T. 1/10/18, at 4.

[2] We note that Appellant purported to appeal the October 30, 2020, Order of the trial court denying his post-sentence motion.  Notice of Appeal, 11/30/20.  "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions."  **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted).  We have corrected the caption accordingly.

---

*Former Justice specially assigned to Superior Court.

license, carrying firearms on public streets in Philadelphia, and possession of an instrument of a crime.[3]  After careful review, we affirm.

Appellant and co-defendant Miguel Garcia were initially tried together before a jury on June 10, 2002, for the murder of Mary Edmonds (Decedent), in 2001.  Trial Court Opinion, 1/29/21, at 1.  Appellant was found guilty of first-degree murder, robbery, criminal conspiracy to commit robbery, and possession of an instrument of crime.  Appellant was sentenced to life without the possibility of parole for first-degree murder and given lesser sentences, to run concurrently on the remaining convictions.  **Id.** at 1.

This Court vacated Appellant's sentence on June 8, 2004, based upon a violation under **Bruton v. United States**, 391 U.S. 123 (1968),[4] and remanded for a new trial.  **Commonwealth v. Brown**, 853 A.2d 1029 (Pa. Super. 2004).  **Id.** at 2.  However, our Supreme Court overturned this Court's ruling and reinstated Appellant's sentence on June 26, 2007. **Commonwealth v. Brown**, 925 A.2d 147 (Pa. 2007).

---

[3] 18 Pa.C.S. §§ 2502(c), 903(a), 3701(a), 6106(a), 6108, and 907(a), respectively.

[4] The United States Supreme Court held in **Bruton**, "[t]hat where the statement of a non-testifying co-defendant names the defendant as a participant in the crime, even if the jury is instructed to consider the confession only against the co-defendant as maker of the statement, the defendant is denied his Confrontation Clause rights."  **Commonwealth v. Brown**, 853 A.2d 1029, 1034-35 (Pa. Super. 2004) (citations and footnotes omitted).

Appellant filed a petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, on October 17, 2007, alleging ineffective assistance of counsel. The petition was dismissed by the PCRA court on June 30, 2009, and Appellant did not seek review of this dismissal in this Court.

Appellant next filed a federal habeas petition in the United States District Court for the Eastern District of Pennsylvania on August 31, 2009, claiming prosecutorial misconduct regarding the alleged **Bruton** violation and ineffective assistance of counsel. **Id.** This petition was denied on April 16, 2014. **Brown v. Folino**, No. 2:09-CV-3970-CDJ, 2014 WL 1489464 (E.D.Pa. 2014). Appellant sought review in the United States Court of Appeals for the Third Circuit. On August 22, 2016, the Third Circuit overturned the Pennsylvania Supreme Court's 2007 ruling and held that Appellant was entitled to a new trial. **Brown v. Superintendent Greene SCI**, 834 F.3d 506 (3rd Cir. 2016).

Appellant proceeded *pro* se, with the assistance of stand by counsel, to a non-jury trial on September 15, 2020. The trial court summarized the relevant evidence presented at trial as follows:

> On the evening of February 23, 2001, [Appellant], accompanied by two associates, Miguel Garcia and Anthony Cheatham, shot and killed Mary Edmunds ("the Decedent") during the course of a robbery.
> Miguel Garcia, a cooperating co-defendant, testified that on the night of February 23, 2001, Garcia and Cheatham had been out driving in the area of Northwest Philadelphia, looking to buy marijuana. While driving around, the two encountered [Appellant], known to Garcia and Cheatham, at the time, only as

- 3 -

an acquaintance through a mutual friend. Garcia informed [Appellant] they were looking to buy marijuana and Xanax and planned to drive to North Philadelphia where they would be able to buy the drugs. [Appellant] asked if he could go with them.

Once in North Philadelphia, the three arrived at a house somewhere around North 7th Street. Garcia entered the house alone to purchase Xanax and marijuana for the group. Once Garcia returned to the car, [Appellant], Garcia and Cheatham each took the Xanax, smoked some marijuana, and began joy riding around North Philadelphia. Eventually, the three made their way back toward Northwest Philadelphia and discussed buying more marijuana to continue the night. Garcia told [Appellant] that he did not have any more money so [Appellant] suggested they rob someone. Garcia responded, "who?", and [Appellant] said "the first person you see."

[Appellant], Garcia, and Cheatham stopped at a Hess Gas Station on the corner of 15th Street and Cheltenham Avenue to fuel up. The three then continued south on 15th Street, and within yards of the gas station, came across the [D]ecedent walking north, wheeling a shopping cart and carrying a purse. [Appellant] instructed Garcia to stop the car. Garcia pulled over and [Appellant] got out of the car. Garcia testified that he waited about a minute after [Appellant] left the car before he followed him. Garcia walked toward the back of the vehicle, and saw [Appellant] struggling with [D]ecedent—the [D]ecedent facing toward Garcia and [Appellant] facing away. Garcia specifically noted that he saw the two "pulling back and forth" and a gun in [Appellant's] hand. Seeing the robbery was already underway, Garcia got back inside the car. Seconds after returning to the car, Garcia testified that he heard a single gunshot. [Appellant] returned to the car. Garcia asked [Appellant], "what the fuck did you do." [Appellant] pointed the gun at Garcia and told him to "drive the fucking car". From there, Garcia drove himself, [Appellant], and Cheatham to Garcia's mother's house.

After being at Garcia's mother's house for about ten to fifteen minutes, the three left. Garcia picked up his friend, Donavan Weary, also known as "Raheem", and dropped Cheatham off at his grandmother's house. [Appellant], Garcia, and Weary then drove to North Philadelphia to continue to smoke marijuana, take more pills, and drink. According to Garcia, he, [Appellant], and Weary eventually fell asleep in the car somewhere in North Philadelphia. Garcia recalled waking up in the driver's seat to police cruiser lights coming up behind him. As all three were

- 4 -

awakened, [Appellant] said to Garcia that he's "not trying to go to jail," so Garcia drove off with the police in pursuit. After a brief chase, Garcia's car slipped on ice and crashed by the side of the road. Once the car came to a stop, [Appellant] threw the gun into Garcia's lap. While trying to get out of the car, Garcia fumbled with the gun but maintained possession of it and began to run, tossing it several yards away as he ran.

Anthony Cheatham also testified at [Appellant's] trial. Cheatham claimed to remember very little of the incident so the Commonwealth refreshed his recollection with his testimony from the previous trial. Cheatham testified that he first met [Appellant] on the night of the murder when he entered the car with [Appellant] and Miguel Garcia. Cheatham recalled that the three spent the day driving around and getting high on Xanax and marijuana. Cheatham remembered waking up in the backseat of Garcia's car to the sound of gun shots. Neither Garcia nor [Appellant] were in the car when he heard the shots, but returned to the car within seconds and [Appellant] was carrying a gun. [Appellant] then pointed the gun at Garcia and said "drive the fucking car." From there, Garcia drove off and Cheatham next remembered being at his grandmother's house.

Chief Inspector Daniel Ma[c]Donald testified that in the early morning of February 24, 2001, while patrolling the area around 5th Street and Hunting Park Avenue, he observed a car traveling without its headlights and proceeded to pursue it. The car pulled over and came to a stop on the side of 5th Street, just short of Hunting Park Avenue. Chief M[a]cDonald noticed that the car was not shut off nor placed in park, but instead, remained with its break lights on. He instructed his partner, Officer Brian Gress, to wait in the police car. Almost immediately, the car fled and Chief M[a]cDonald followed. After making a few quick turns, the car slipped on a patch of ice, crashed into debris on the side of the road, and became immobile.

Chief M[a]cDonald could see the driver of the vehicle, Miguel Garcia, get out of the car and "fumble" with a silver revolver. M[a]cDonald informed his partner that Garcia had a gun and instructed him to pursue Garcia. When Chief M[a]cDonald approached the vehicle, he found [Appellant] and Donovan Weary struggling to get out of the car, and immediately apprehended them. Shortly thereafter, Officer Gress notified Chief M[a]cDonald that he had taken Garcia into custody as well.

Officer Brian Gress testified that while pursuing Garcia after he fled on foot, Officer Gress observed him throw an unknown

object into a backyard of 280 West Wingohocking Street. Officer Gress chased Garcia for approximately two blocks before apprehending him. Once Garcia was placed under arrest, Officer Gress returned to the rear yard of 280 West Wingohocking Street and recovered a set of car keys and a .38 caliber silver revolver.

The Commonwealth and [Appellant] stipulated that if Police Officer John Cannon, the ballistician at the time of [Appellant's] original trial, testified, he would testify that the recovered revolver contained three [fired] cartridge casings and three live rounds. There was gunshot residue in the individual barrels. Moreover, Officer Cannon received a bullet fragment recovered by the medical examiner, from the decedent's body, and determined that it was fired from the revolver recovered from Garcia.

The Commonwealth and [Appellant] stipulated to the prior trial testimony of medical examiner Dr. Preston being admitted into evidence. Dr. Preston found that the cause of the decedent's death was a single bullet which entered her right upper breast, traveled downward, exited the lower chest, reentered her abdomen, passed through the liver, the pancreas and the bowel and lodged just behind her left hip. The bullet was retrieved from near the decedent's left hip.

Trial Court Opinion, 1/29/21 at 4-7 (record citations omitted).

On September 17, 2020, the trial court found Appellant guilty of the aforementioned crimes and sentenced him to seventeen (17) years to thirty-four (34) years of incarceration for third-degree murder. No further sentence was imposed on the remaining crimes. Appellant filed a post-sentence motion, which was denied by the trial court on October 20, 2020, and he timely appealed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved"[5]:

I.   Should the Appellant be awarded an arrest of judgment on each of the charges, where as here, the evidence was insufficient to sustain the verdict?

II.  Should the Appellant be awarded a new trial, where as here, the evidence failed to establish the existence of a conspiratorial agreement to commit robbery?

III. Should the Appellant be awarded a new trial where, as here, the trial court abused it's discretion in disallowing the Appellant the funds to hire a handwriting expert?

Appellant's Brief at 3.[6]

Initially, we note that challenges to the sufficiency of the evidence and the weight of the evidence are two distinct challenges. When reviewing a sufficiency of evidence claim, this Court is required to view all the evidence admitted at trial in the light most favorable to the verdict winner, to determine whether sufficient evidence was presented to allow the finder of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Dunkins*, 229 A.3d 622, 631 (Pa. Super. 2019) (citation omitted). Wholly circumstantial evidence is sufficient to prove every element of the crime

---

[5] Although Appellant proceeded *pro se* with the assistance of stand-by counsel at trial, Appellant is represented by counsel before this Court.

[6] We note with disapproval that Appellant's brief was filed late, despite having been granted an extension of time. Order, 3/18/21. Because the Commonwealth has not moved for dismissal of the appeal pursuant to Pa.R.A.P. 2188, we disregard Appellant's non-compliance and address the substantive issues on appeal. *See* Pa.R.A.P. 105(a).

beyond a reasonable doubt. *Id.* The finder of fact is free to believe all, part or none of the evidence presented. *Id.* In reviewing this claim, the appellate court may not reweigh the evidence and substitute its judgment for that of the factfinder. *Id.* at 632 (citation omitted). Where the evidence presented at trial is insufficient to sustain a guilty verdict, a judgment of acquittal will be awarded. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (citation omitted).

A challenge to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. *Widmer*, 744 A.2d at 751. In reviewing a claim that the verdict is against the weight of the evidence, this Court is not to determine whether the verdict is against the weight of the evidence, but is to review whether the trial court abused its discretion in ruling on the weight claim. *Dunkins*, at 634 (citations omitted). The verdict of the trial court may only be reversed where it is "so contrary to the evidence as to shock one's sense of justice." *Id.* A successful challenge to the weight of the evidence garners a new trial. *Widmer*, 744 A.2d at 751 (citation omitted).

Instantly, Appellant conflates his sufficiency and weight claims throughout his concise statement and brief. In his concise statement, while Appellant seeks a new trial, he alleges that the evidence was insufficient to sustain the verdict. Rule 1925(b) Statement, 1/6/21, at ¶¶ 1, 3, 4. Likewise, Appellant argues in his brief that he is entitled to arrest of judgment because the evidence is insufficient to sustain the verdict and then argues he is entitled

to a new trial because the evidence failed to establish the existence of a conspiratorial agreement to commit robbery. Appellant's Brief, at 6, 12.

The substance of the arguments raised by Appellant in his brief, as well as the caselaw cited, highlight a sufficiency of the evidence challenge, rather than a challenge to the weight of the evidence. Therefore, we will address Appellant's issues raised on appeal as challenges to the sufficiency of the evidence.

Appellant claims that the testimony of Garcia and Cheatham was so unreliable that it led to a verdict based upon nothing more than conjecture or surmise. Appellant's Brief at 6. Appellant maintains that the "evidence adduced was so unreliable, contradictory and inconsistent that it is incapable of supporting a verdict of guilty." **Id.** at 7. In support of this argument, Appellant relies upon **Commonwealth v. Karkaria**, 625 A.2d 1167 (Pa. 1993), wherein our Supreme Court reversed a conviction for forcible rape, where the evidence, in its entirety, was so unreliable and contradictory that the guilty verdict rendered could not have been based upon anything other than conjecture and surmise.[7]

---

[7]The Commonwealth argues that Appellant waived this sufficiency claim because he failed to enumerate which convictions and what elements of the crime he is challenging in his Rule 1925(b) statement, thereby depriving the trial court the opportunity to address the claim in its Rule 1925(a) opinion. Commonwealth's Brief at 14, n.2 (citing, **Commonwealth v. Lemon**, 804 A.2d 34, 27 (Pa. Super. 2002) (requiring a concise statement to specify the crimes and elements challenged).

In **Karkaria**, Ian Karkaria was found guilty of forcibly raping his 14-year-old stepsister. This Court affirmed the judgment of sentence, and on appeal to our Supreme Court, Karkaria argued that "the testimony presented to the jury was so unreliable and contradictory that the verdict could only have been arrived at through speculation and conjecture." **Karkaria**, 625 A.2d at 1170.

While the **Karkaria** Court acknowledged that questions of credibility are to be resolved by the finder of fact and the verdict will not be disturbed if the evidence is credible, the Supreme Court recognized the following:

> This concept, however, must be distinguished from an equally fundamental principle, that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

**Karkaria**, 625 A.2d at 1170 (citations omitted).

Even when viewed in the light most favorable to the Commonwealth, our Supreme Court determined that the record was "riddled with inconsistencies" and the victim's testimony was "disturbingly vague", casting "serious doubt upon the jury's ability" to find that the crime of rape occurred during the time alleged. **Karkaria**, 625 A.2d at 1171. According to the victim, the assaults took place when Karkaria babysat on Friday and Saturday nights, and Karkaria's brother Andre was never in the home at that time. **Id.** However, the victim acknowledged that during the six-month period in 1984,

- 10 -

Karkaria did not act as a babysitter, and evidence of record showed that Andre was in the home every other weekend, and on alternate weekends. *Id.* The only incident of intercourse of record occurred in 1981, despite the victim's description of numerous rapes. *Id.* Our Supreme Court concluded that the evidence presented at trial was based on nothing more than speculation and conjecture, and therefore, was so unreliable and contradictory that it was incapable of supporting a verdict of guilty and was insufficient as a matter of law. *Id.* at 1172.[8]

The instant matter is not a case where the trial court rendered a verdict based solely upon vague and contradictory evidence that fails to establish the elements of the crimes charged. While it is evident from the record that portions of Garcia's testimony were inconsistent and contradictory, the trial court found Cheatham's testimony credible, which corroborated Garcia's somewhat inconsistent testimony and provided independent evidence of Appellant's perpetration of these crimes. N.T. 9/17/20, at 123-24.

---

[8]We decline to find Appellant waived this sufficiency claim for failing to specify the crimes and elements charged in his concise statement. Appellant's Rule 1925(b) statement specifically states he is challenging the sufficiency of evidence regarding all elements of all crimes charged. Moreover, although he does not mention *Karkaria* specifically, and intermingles his sufficiency and weight claims, he sets forth a challenge that the verdict was based upon conjecture and surmise, which was the substance of the claim in *Karkaria*. *See* Rule 1925(b) Statement, 1/6/21. Although Appellant's concise statement is not a model of concise artful drafting, we conclude he has preserved in his brief the type of sufficiency claim encompassed by *Karkaria*.

Garcia and Cheatham were in the vehicle with Appellant the night the Decedent was shot. N.T. 9/16/20, at 39-41. It was Appellant who suggested to Garcia that they rob the first person they encountered, and Garcia stopped the vehicle at Appellant's direction, upon seeing the Decedent with a purse on her shoulder. N.T. 9/16/20, at 45-48. Garcia saw Appellant exit the vehicle and engage in a physical altercation with the Decedent while attempting to rob her at gunpoint. *Id.* at 49-52. Both Garcia and Cheatham testified that Appellant was outside the vehicle when they heard gunshots. *Id.* at 52; N.T. 9/15/20, at 117-19;132. Both Garcia and Cheatham saw Appellant with a firearm when he returned to the vehicle. *Id.* at 53; N.T. 9/15/20 at 120-21.

When Appellant returned to the vehicle, both Garcia and Cheatham saw Appellant point the gun at Garcia and tell him to "drive the fucking car". *Id.* at 53; N.T. 9/15/20, at 133-34. Appellant threw the firearm into Garcia's lap when the vehicle crashed on the side of the road. N.T. 9/16/20, at 59-67. The Commonwealth and Appellant stipulated that a purse was recovered near the Decedent's body at the crime scene. N.T. 9/17/20, at 80.

There was independent evidence that the revolver recovered from Garcia contained three fired cartridge casings, three live rounds and gunshot residue on the barrels. N.T. 9/17/2020, at 71-72. Moreover, the medical examiner determined that the Decedent died as a result of a single bullet wound and the bullet retrieved from the Decedent's body was fired from the revolver recovered from Garcia. N.T. 9/17/20, at 73-74.

Appellant argues that the testimony of Garcia and Cheatham was not credible because it was contradictory and inconsistent, thereby leading to a verdict based upon conjecture and surmise. However, Appellant's reliance on *Karkaria* is misplaced. Appellant's arguments attack the credibility of the testimony, rather than whether the evidence offered established the crimes charged. It is within the sole province of the trial court whether to believe all, part or none of the testimony. *Dunkins*, 229 A.2d at 632. Although the trial court determined that Garcia's testimony emanated from a "corrupt source" and was not wholly credible, the trial court did find the testimony of Cheatham credible, which corroborated some of the testimony offered by Garcia. N.T. 9/17/20, at 123-24.

The present matter does not constitute an "exceptional circumstance" wherein *Karkaria* is applicable. *See Commonwealth v. Brown*, 52 A.3d 1139, 1165-66 (Pa. 2012) (declining to apply *Karkaria* stating that "[o]ur Court will not, on sufficiency review, disturb the finder-of-fact's resolution except in those exceptional instances …, where the evidence is so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence").

Accordingly, we conclude that the trial court's decision to convict Appellant of each of the crimes charged is supported by sufficient evidence.

Appellant next contends that he is entitled to a new trial "where the evidence failed to establish the existence of a conspiratorial agreement to

commit robbery." Appellant's Brief at 12; Rule 1925(b) Statement, 1/6/21, ¶4. Appellant argues that there was no evidence of a conspiratorial agreement between he and Garcia. Specifically, Appellant contends that Cheatham testified that he never saw a robbery or shooting; therefore, "merely because [] Appellant may have been in the presence of Miguel Garcia outside the vehicle when the shooting occurred isn't sufficient to infer an agreement existed." Appellant's Brief at 12.

The trial court addressed this issue as a challenge to the weight of the evidence, finding that the "verdict was not so contrary to the evidence as to shock one's sense of justice." Trial Court Opinion, 1/29/21, at 13-14. Specifically, the trial court opined that while it believed only some of the evidence, "nevertheless, the evidence overwhelmingly established the [Appellant's] guilt beyond a reasonable doubt." *Id.* at 14.

The trial court determined that Appellant initiated the conspiracy to rob the Decedent; ordered Garcia to stop the car; and exited the car, becoming involved in a scuffle with the Decedent. *Id.* at 14. The trial court further found that although Garcia followed Appellant out of the vehicle and was caught with the gun, it mattered not who fired the shot because Appellant and Garcia were involved in a conspiracy to rob the Decedent. *Id.* Finally, the trial court credited the testimony of Cheatham that although Garcia and Appellant were outside the vehicle when the shot was fired, it was Appellant

who returned to the vehicle with the gun and pointed it at Garcia stating, "drive the fucking car." *Id.*

While Appellant appears to challenge to the weight of the evidence by requesting a new trial, the substance of his argument continues to challenge the sufficiency of the evidence, except this time he focuses on the single charge of conspiracy to commit robbery. Appellant argues that "[i]f, as the trial court said, it was a conspiracy to commit robbery, then the evidence would have to meet the criteria to establish a conspiracy." Appellant's Brief, at 12. Because Appellant argues that the evidence is insufficient to establish a conspiracy, he is asking this Court to review the sufficiency of the evidence rather than the weight of the evidence. *See Dunkins*, 229 A.3d at 631.

To convict an individual of conspiracy,

[T]he trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. 18 Pa.C.S.[A]. §903. The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators.

Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit a crime. There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator. Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by

the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators. Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.

*Id.* (citations omitted).

Prior to stopping for gas, Appellant suggested to Garcia that they purchase more marijuana. N.T. 9/16/20, at 45. When Garcia told Appellant he did not have any money to buy marijuana, Appellant said to him, "let's take someone's money, then." *Id.* at 46. Garcia asked Appellant "who?" and Appellant responded, "the first person you see." *Id.* Garcia drove until Appellant directed him to stop on 15th Street, where they saw the Decedent with a purse on her shoulder. *Id.* at 48. Garcia observed Appellant struggling with the Decedent, heard a gunshot, and observed Appellant with a gun when he returned to the vehicle. *Id.* at 51-53. Cheatham testified that Appellant told Garcia to stop the car. N.T. 9/15/20, at 129-131. When Garcia stopped the vehicle, Cheatham saw Appellant and Garcia get bout of the car, and then he heard gunshots. *Id.* at 118. When Appellant got back in the vehicle, Cheatham saw Appellant point the gun at Garcia and tell him to "drive the fucking car." *Id.* at 133 .

While it is difficult to prove the existence of a formal agreement to engage in a conspiracy to commit a crime, the evidence of record, both direct and circumstantial, provided proof that Appellant intended to commit the

crime with his co-conspirator. The trial court did not have to identify the shooter because once the trial court determined that Appellant was part of a conspiracy, Appellant was liable for any overt acts committed in furtherance of the conspiracy, regardless of which co-conspirator committed the act. **See Dunkins**, 229 A.3d at 633.

Although the trial court found that Garcia's testimony was questionable because it came from a "corrupt source", the trial court believed Garcia when he testified that Appellant suggested they commit a robbery, and he agreed. It was within the sole province of the trial court, as the factfinder, to weigh this evidence and the trial court was free to find all, none, or part of Garcia's testimony credible. **Id.** at 634.

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that the trial court's decision to convict Appellant of conspiracy to commit robbery is supported by sufficient evidence.

Finally, Appellant contends that the trial court abused its discretion in denying him funds to hire a handwriting expert. Appellant's Brief at 14. By way of background, Appellant, acting *pro se* with the assistance of stand-by counsel, argued during a pre-trial motion hearing that he received an unsigned letter on or about March 26, 2019, purportedly written by Garcia, wherein Garcia admitted his guilt in this matter. N.T. 8/13/2020, at 17. According to Appellant, the letter set forth a "plan to orchestrate, mastermind and concoct to frame the [Appellant] in order so that [Garcia] can get released [from

prison]... ." ***Id.*** Appellant believed Garcia wrote this letter using his left-hand "in an attempt to disguise his writing." ***Id.*** Appellant requested $5,800 to hire a handwriting expert to analyze the letter and use it to impeach Garcia's credibility at trial. ***Id.*** Appellant intended to compare the handwriting in a letter written by Garcia in 2008 to the handwriting in the 2019 letter in order to prove that the 2019 letter was written by Garcia. ***Id.***

The trial court concluded that because this was a non-jury trial, the trial court could determine the credibility of Garcia's testimony regarding whether he wrote this letter, without the assistance of an expert. N.T. 8/13/2020 at 18. The trial court stated that this was not a case where an unknown individual was confessing to a crime. ***Id.*** The trial court explained that Garcia was a co-defendant in this matter, the Commonwealth intended to call him as a witness, and Appellant would have an opportunity to cross-examine him. ***Id.*** Finally, the trial court expressed doubt as to whether Appellant could successfully prove that the 2019 letter was written by Garcia by comparing the handwriting to a letter Garcia wrote in 2008. ***Id.*** Therefore, the trial court denied Appellant's request for funds to hire a handwriting expert. ***Id.***

In considering the merits of this claim, the Court is guided by the following principles:

> It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. The state has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to

> obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense.

*Commonwealth v. Tighe*, 184 A.3d 560, 580 (Pa. Super. 2018) (citations omitted). There is no obligation to provide public funds to an indigent defendant to hire an expert simply because the defendant requests these funds. *Commonwealth v. Curnutte*, 871 A.2d 839, 842 (Pa. Super. 2005) (citations omitted). "There must be some showing as to the content and relevancy of the proposed expert testimony before such a request will be granted." *Id.* at 842 (citation omitted). Lastly, "[t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion." *Commonwealth v. Cannon*, 954 A.2d 1222, 1226 (Pa. Super. 2008) (citation omitted).

Applying the foregoing principles, we conclude Appellant has failed to establish that he was entitled to funds to hire a handwriting expert. As the trial court explained, it was not essential to Appellant's defense that he have the letter analyzed by an expert to challenge the credibility of Garcia's testimony. N.T. 8/13/20 at 118-119. Appellant used the March 29, 2019, letter on cross-examination at the non-jury trial to challenge Garcia's credibility. N.T. 9/16/20 at 144-45.

Garcia denied writing the letter and as the trial court opined, "[t]he speculative testimony of an expert would not have offered any more than the Defendant's own cross examination of Garcia already did, particularly in light of the claim that Garcia supposedly wrote the letter with his non-dominant hand." Trial Court Opinion, 1/29/21, at 16. The trial court, as the trier of fact, determined that Garcia's testimony was not credible and rendered its guilty verdict based upon the credible testimony of Cheatham. N.T. 9/17/20 at 123-24. Therefore, an expert's opinion as to who wrote this letter would not be relevant. Consequently, we conclude that the trial court did not abuse its discretion in denying Appellant's request for funds for a handwriting expert.

Based on the foregoing reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2021

- 20 -